## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

KALPESH PATEL, et al.,        )
       Petitioner,         )
                          )       **No. 3:19-cv-00489**
**v.**                        )       **Judge Richardson/Frensley**
                          )
**RUSSELL WASHBURN,**      )
       Respondent.        )

## REPORT AND RECOMMENDATION

In 2015, a jury convicted Petitioners Kalpesh and Pratikkumar V. Patel ("Petitioners")[1] each of one count of conspiracy to commit first degree murder and one count of solicitation to commit first degree murder. *Tennessee v. Patel*, No. M2016-00460-CCA-R3-CD, 2017 WL 3669626 (Tenn. Crim. App. Aug. 25, 2017); *perm. app. granted* (Tenn. Jan. 17, 2018); Docket No. 1-1, pg. 1. Their solicitation convictions were merged into their conspiracy convictions, and each was sentenced to fifteen years' incarceration. *Id.* Petitioners appealed their convictions to the Tennessee Court of Criminal Appeals, which affirmed their convictions. *Id*. The Tennessee Supreme Court declined permission to appeal. Docket No. 1, pg. 5. Petitioners filed requests for post-conviction relief, which were dismissed by the Rutherford County Circuit Court. *Patel v. State*, No. M2018-01885-CCA-R3-PC, 2019 WL 5618962, at *1. The dismissal of their requests was affirmed on appeal by the Tennessee Court of Criminal Appeals. *Id.* at *9.

Having exhausted their attempts to seek relief in state courts, Petitioners now allege in federal court that errors committed in the state proceedings violated their rights under the United States Constitution. Specifically, Petitioners request that this Court find: (1) that the improper admission of evidence extracted from Petitioner Pratikkumar's cell phone was wrongly considered

---

[1] Because Petitioners share a last name, they will be referred to by their first names as they have been in previous proceedings. No disrespect is intended.

under harmless error analysis and should have instead been analyzed as a structural error and (2) that Petitioners were denied effective assistance of counsel in violation of the Sixth Amendment because of this evidentiary error. Docket No. 1, pg. 9. Petitioners ask for habeas corpus relief pursuant to 28 U.S.C. § 2254. Docket No. 1, pg. 4.

Because Petitioners have not shown that the state court's adjudication of Petitioners' claim can be construed as contrary to or an unreasonable application of clearly established federal law and no other proceedings are necessary, the undersigned recommends that habeas corpus relief be **DENIED**.

## I.  BACKGROUND

In deciding Petitioners' appeal, the Tennessee Court of Criminal Appeals summarized the factual background of this case:

> Christopher Robinson testified at trial that he was a construction worker living in Rutherford County and that he had never been arrested or in any kind of "criminal" trouble. Mr. Robinson further testified that he had known Petitioner Kalpesh Patel for six or seven years. Mr. Robinson explained that he had frequented one of Kalpesh's stores, that he got to know Kalpesh, and that he then began doing construction jobs at Kalpesh's stores and home. Mr. Robinson recalled that in September 2013, he was "doing a water line" at one of Kalpesh's stores when Kalpesh asked Mr. Robinson if he "would like to do some work for one of [Kalpesh's] cousins at another store." Mr. Robinson told Kalpesh that he "would be interested."

> On September 29, 2013, Kalpesh called Mr. Robinson and asked him to meet at the store to discuss the work with Kalpesh's cousin. When he arrived at the store, Kalpesh had Mr. Robinson go to "the back room" where Petitioner Pratikkumar Patel was waiting for them. Mr. Robinson testified that he had never met Pratikkumar before. Mr. Robinson claimed that Pratikkumar had a gun "[o]n his side" during their meeting and this made Mr. Robinson "real nervous." According to Mr. Robinson, Pratikkumar stated that he needed "someone to kill [his] wife" and that he would pay $50,000 "to have it done." Mr. Robinson testified that he initially thought the Petitioners "were joking around," but Pratikkumar "kept going into details [about] how he wanted it done."

Mr. Robinson explained that Pratikkumar wanted his wife shot and a "backup plan" in case "it could not go that route." According to Mr. Robinson, Pratikkumar wanted his wife killed "as soon as possible." Pratikkumar told Mr. Robinson that he would leave his house around 8:00 a.m., that he wanted his wife killed by 8:30 a.m., and that he "would come back and make sure the job was done." Kalpesh was to pay Mr. Robinson once Pratikkumar confirmed that his wife was dead. Mr. Robinson testified that Pratikkumar stated that his wife "had to be gone" and that Pratikkumar seemed "very excited" that his wife would soon be dead.

According to Mr. Robinson, Pratikkumar provided Mr. Robinson with his wife's address, a description of her car, and her license plate number. Pratikkumar told Mr. Robinson that Kalpesh would provide him with a gun the next day. Pratikkumar also told Mr. Robinson that his "daughter would be asleep in [her] bedroom" and that Mr. Robinson was to shoot his wife and "let the little girl sleep." Mr. Robinson recalled that "[i]t didn't matter" to Pratikkumar if he killed Pratikkumar's wife or arranged for someone else to "as long as it was taken care of." Mr. Robinson was left with the impression that "[t]he only thing [Pratikkumar] wanted to make sure [of] was that [his wife] was dead."

Mr. Robinson testified that Pratikkumar was "[k]ind of upset" when he suggested that Pratikkumar "get a divorce." According to Mr. Robinson, Pratikkumar stated "that he had two people in Gallatin that [were] going to take care of" killing his wife, but that he wanted Mr. Robinson "to do it" because Kalpesh trusted him. Mr. Robinson recalled that Kalpesh was in the room during this conversation with Pratikkumar and that Kalpesh was "shaking his head" in agreement with what Pratikkumar was saying.

Mr. Robinson testified that he was "in shock" during his conversation with the Petitioners. Mr. Robinson further testified that he told Pratikkumar that he "would make sure that it happened" in order to "buy time for" Pratikkumar's wife. Pratikkumar then left the store. According to Mr. Robinson, he asked Kalpesh why Pratikkumar could not just get divorced and Kalpesh told him that Pratikkumar's "family would disown him if [he] got a divorce." Mr. Robinson also claimed that Kalpesh told him that Pratikkumar "had this planned for a long time." Mr. Robinson testified that he then left the store and went to work without telling anyone about what had happened because he "thought it was a joke."

The next morning, September 30, 2013, Kalpesh called Mr. Robinson and asked to meet him in the parking lot of a Sam's Club in order to pay him for a previous construction job. Kalpesh did not tell Mr. Robinson that Pratikkumar would also be there. Mr. Robinson parked his truck and, after a few minutes, Kalpesh parked his van on one side of the truck and Pratikkumar parked his van on the other side of the truck. A recording from the Sam's Club's video surveillance system depicting the parking lot at approximately 9:30 a.m. on September 30, 2013, was played for the jury. Mr. Robinson identified his truck and the Petitioners' vans on the

surveillance video. According to Mr. Robinson, Kalpesh got out of his van and got into Pratikkumar's van. A short time later, Kalpesh called Mr. Robinson and told him that Pratikkumar wanted to talk to him.

According to Mr. Robinson, Kalpesh got out of Pratikkumar's van holding "a sack." Mr. Robinson testified that when he got in Pratikkumar's van, he asked "what was in the bag," and Pratikkumar responded that he had given Kalpesh "$50,000 in cash." Mr. Robinson further testified that Pratikkumar told him that Kalpesh was taking the money "to trade that cash in" at a different bank so "it would not be traced back to the bank" it was withdrawn from. Mr. Robinson claimed that Pratikkumar then "started describing everything that he wanted done." Pratikkumar gave Mr. Robinson a picture of his wife, and Mr. Robinson used his cell phone to take a picture of it. Pratikkumar also gave Mr. Robinson his address, a description of his wife's car, and "her tag number." Mr. Robinson testified that he wrote all of this information down on a piece of paper.

Mr. Robinson claimed that Pratikkumar said that he wanted his wife killed the next morning. According to Mr. Robinson, Pratikkumar told his wife that a "handyman" would be coming to their house that morning to make some repairs. Pratikkumar instructed Mr. Robinson to shoot his wife in their bedroom and to "throw stuff around" so it would look "like a robbery gone bad." Mr. Robinson further claimed that Pratikkumar told Mr. Robinson to let his daughter "sit there and cry" if she woke up during the murder. Mr. Robinson further testified that he and Pratikkumar discussed having "another person" commit the murder. Mr. Robinson claimed that he agreed to arrange the killing without "getting [any]thing out of it."

Mr. Robinson testified that he told Pratikkumar that he would "make sure that it got done" and went back to his truck. As Pratikkumar drove away, Mr. Robinson wrote down Pratikkumar's license plate number and a description of the van on the same sheet of paper that he had previously written down the information about Pratikkumar's wife on. Mr. Robinson testified that he then went to one of Kalpesh's stores. According to Mr. Robinson, Kalpesh gave him a box containing $15,000 in cash. Mr. Robinson also claimed that Kalpesh stated that he had not bought a gun, that he wanted Mr. Robinson "to purchase the gun," and that he would give Mr. Robinson "a couple thousand dollars for the gun after it was all said and done." Kalpesh then allegedly instructed Mr. Robinson to dispose of the gun after the murder by throwing it in a river.

Mr. Robinson testified that, after the events of that morning, he believed the Petitioners were serious about having Pratikkumar's wife killed. Mr. Robinson called a local attorney, Rick Mansfield, and told him about his conversations with the Petitioners. Mr. Mansfield had Mr. Robinson call another local attorney who was a former prosecutor and had contacts with the Tennessee Bureau of Investigation (TBI). As a result of these conversations, Mr. Robinson was contacted by TBI Special Agent Caleb Utterback. Agent Utterback met with Mr. Robinson at one of Mr. Robinson's jobsites. Mr. Robinson gave Agent Utterback the box

containing $15,000 and the piece of paper with the information he had written down during his meeting with Pratikkumar at Sam's Club. Mr. Robinson also showed Agent Utterback the picture of Pratikkumar's wife that he had taken with his cell phone.

Later that day, Pratikkumar called Mr. Robinson. Mr. Robinson did not answer the phone and contacted Agent Utterback. Agent Utterback arranged to meet Mr. Robinson in the parking lot of a local store, so Mr. Robinson could call back Pratikkumar and their conversation could be recorded. Pratikkumar did not answer his phone when Mr. Robinson called him, but he called Mr. Robinson back a short time later. This conversation was recorded and played for the jury at trial. Mr. Robinson started the conversation by confirming the license plate number of Pratikkumar's wife's car. The following exchange then occurred:

[Mr. Robinson]: [Okay], what time did you want me to be at Almaville Market tomorrow?

[Petitioner Pratikkumar]: Um, you mean after you finish the work?

[Mr. Robinson]: Yeah, after the work['s finished. I mean he's going to be doing the work, but what time do you want me there at the store?

[Petitioner Pratikkumar]: Oh, you can meet anytime. I mean as soon as you call me from the store, the work is done; your work is done too.

[Mr. Robinson]: [Okay], so, and [Petitioner Kalpesh] does have the rest of the money sitting there, right?

[Petitioner Pratikkumar]: Yep ....

[Mr. Robinson]: [Okay], I mean, uh

[Petitioner Pratikkumar]: I mean as soon as you know on your phone that it's done. You know? Then [Petitioner Kalpesh] will take care of it. He'll get it before he gets there.

[Mr. Robinson]: [Okay], I just wanted to make sure, buddy, because my man is asking me, and I just need to make sure that everything's lined up and set to go. But you are sure you want this done?

[Petitioner Pratikkumar]: What did you say?

[Mr. Robinson]: I said, you are sure that you want this done? Cause once I hang up it's over with. Come tomorrow at [8:30 a.m.] it's done.

[Petitioner Pratikkumar]: Yes, I want everything done by [8:29 a.m.], not even

[8:30 a.m.] ... everything should be done.

[Mr. Robinson]: [Okay], you want it done by [8:30 a.m.]? [Petitioner Pratikkumar]: That's it. No back up now.

[Mr. Robinson]: [Okay], well, I'm not going to back out. What time are you going to be leaving the house?

[Petitioner Pratikkumar]: [8:00 a.m.].

[Mr. Robinson]: [8:00 a.m.]. [Okay], well, everything is lined up, everything is set to go. I will not talk to you [any] more [un]til tomorrow. And once it's done, ah, make sure the money is there because my man's not going to play around.

[Petitioner Pratikkumar]: That's it. You don't need to worry about the rest of the thing. As I say, once this work [is] done [the] right way, the way I want it, you will remember that day. I will always take care of you nicely ....

[Mr. Robinson]: [Okay], buddy, I do appreciate it, I'm fixing to get off here and, uh, I will talk to you tomorrow.
[Petitioner Pratikkumar]: Yeah, I just need you to be 100%, that's what I need.

[Mr. Robinson]: 100%, you've got 110% of me.

[Petitioner Pratikkumar]: That's it man. Alright man.

[Mr. Robinson]: Alright, bye.

[Petitioner Pratikkumar]: Bye.

Shortly after the first conversation ended, Pratikkumar called Mr. Robinson again wanting to make sure that he had "the address and everything." Mr. Robinson confirmed Pratikkumar's address and the description of Pratikkumar's wife's car.

Then, the following exchange took place:

[Mr. Robinson]: I did, [okay]. That's what I wanted to make sure of so everybody's on the right page, and we asked you—

[Petitioner Pratikkumar]: You are my handyman for my new store, [okay]? We are trying to build a counter. And, uh, we are cool and everything and you can invest in it.

[Mr. Robinson]: [Okay].

[Petitioner Pratikkumar]: So make sure you do my work, [okay]?

[Mr. Robinson]: Does your wife know that the handyman is going to be there to work on the doors and the floor in the morning?

[Petitioner Pratikkumar]: Yes, sir.

[Mr. Robinson]: [Okay], and the baby is supposed to be asleep, right?

[Petitioner Pratikkumar]: Yes.

[Mr. Robinson]: [Okay], that's all I need to make sure of buddy. Everything is set to go.

[Petitioner Pratikkumar]: [Okay]. You got it. Bye-bye.

[Mr. Robinson]: Bye.

Mr. Robinson testified at trial that he had no idea what Pratikkumar was referring to when he mentioned a counter being built at a new store. Mr. Robinson admitted on cross-examination that he told the Petitioners that he would not personally kill Pratikkumar's wife. Mr. Robinson also admitted that he told Agent Utterback that he had told the Petitioners that he would "see what [he] could do." Mr. Robinson further admitted that he only pretended to find a "hitman" in order to "buy time" for Pratikkumar's wife and that he had no intention of actually hiring a "hitman" for the Petitioners. However, Mr. Robinson testified that the Petitioners did not know that he was pretending and that they believed he would "make [it] happen." Mr. Robinson speculated that the Petitioners solicited him to kill Pratikkumar's wife because Kalpesh thought he was trustworthy.

Mr. Mansfield testified at trial that he was an attorney practicing mostly in real estate and probate law and that he had known Mr. Robinson for approximately twenty years. Mr. Mansfield explained that he had initially represented Mr. Robinson in a workers' compensation matter. Since the conclusion of that matter, Mr. Mansfield hired Mr. Robinson to do carpentry work for him on numerous occasions. Mr. Mansfield testified that he believed that Mr. Robinson was an "honest person" and that there was "no doubt in [his] mind" that Mr. Robinson was a truthful person. Mr. Mansfield explained that he trusted Mr. Robinson with the keys to his home and office and that he had referred Mr. Robinson to others who needed carpentry work done.

Mr. Mansfield recalled that Mr. Robinson called him on September 30, 2013, and that Mr. Robinson was "terribly upset." Mr. Robinson told Mr. Mansfield about his conversations with the Petitioners and that he had been asked to kill Pratikkumar's wife. Mr. Mansfield testified that he contacted another local attorney, Thomas Parkerson, to ask what Mr. Robinson should do about his conversations with the Petitioners. Mr. Parkerson told Mr. Mansfield that he would "hook [Mr. Robinson]

up with the [TBI]." Mr. Mansfield had Mr. Robinson call Mr. Parkerson and that ended his participation in this matter.

Agent Utterback testified at trial and corroborated Mr. Robinson's testimony about their interactions on September 30, 2013. Agent Utterback testified that arrest warrants for the Petitioners were issued after Mr. Robinson's recorded phone conversations with Pratikkumar. Agent Utterback arrested Kalpesh while other TBI agents arrested Pratikkumar. The Petitioners' wallets and cell phones were seized during their arrests. After their arrests, subpoenas were issued for the Petitioners' cell phone records and Pratikkumar's banking records. Agent Utterback admitted that he never found anyone who had agreed to kill Pratikkumar's wife and that he had no reason to believe that Mr. Robinson would do so.

Pratikkumar's banking records revealed that he had made cash withdrawals of $9,000 from a business account on September 3, September 6, September 12, September 18, September 20, and September 24, 2013. On September 30, 2013, Pratikkumar made a $9,000 withdrawal at 8:43 a.m. and an $8,000 withdrawal at 11:00 a.m. The $17,000 withdrawn on September 30, 2013, was Pratikkumar's largest withdrawal of cash in the previous six months and the only instance during that time when he had withdrawn more than $10,000 in one day. The Petitioners' phone records showed numerous calls between the Petitioners from September 27 to September 30, 2013.

A forensic examination of the Petitioners' cell phones was performed by TBI Special Agent Chet Mason. Agent Mason was able to recover text messages from Pratikkumar to Tina Newman and Marcus T. Henderson, Sr. Agent Mason was also able to recover a deleted text message from Pratikkumar to Kalpesh asking for Mr. Robinson's cell phone number as well as Kalpesh's response. Agent Mason testified at trial that the forensic examination revealed that Pratikkumar had deleted the call logs for his phone calls with Ms. Newman and the text messages, chat threads, and voicemails he had exchanged with her.

Agent Mason testified that he was able to recover Pratikkumar's deleted internet history from the cell phone. Prior to September 30, 2013, Pratikkumar had conducted several internet searches and visited several websites regarding topics such as "can a person go to jail if they accidentally killed someone when shooting a gun in the woods," "homicide definition," "if you shot someone by mistake is it criminal," "what is the prison sentence for killing someone on accident," "if you accidentally committed a serious crime and knew you would go to jail, would you run," and "can you get in trouble if you accidentally kill someone while cleaning your gun."

Ms. Newman testified at trial that she was a recent college graduate and worked at a domestic violence shelter. Ms. Newman recalled that in May 2010, she had gone on a "study abroad" trip to India. In September 2010, Ms. Newman met Pratikkumar at one of his stores and struck up a conversation with him about the

fact that she had "just got back from India." Ms. Newman testified that a few weeks after their initial conversation, she "friended" Pratikkumar on Facebook and they scheduled a lunch date. Ms. Newman further testified that she divorced her husband in January 2011. According to Ms. Newman, she began working as "the errand girl" for Pratikkumar and began a romantic relationship with him around the time of her divorce.

Ms. Newman testified that she was in a romantic relationship with Pratikkumar from January 2011 until his arrest in October 2013. Ms. Newman would share her class schedule with Pratikkumar so "he could arrange his schedule to" hers. When Ms. Newman moved to Cookeville to finish college, Pratikkumar would visit her at least once a week. Ms. Newman testified that Pratikkumar helped pay her rent and college tuition. Ms. Newman made Pratikkumar the beneficiary of her life insurance policy. Ms. Newman and Pratikkumar took trips together. On those trips, Pratikkumar would refer to Ms. Newman as his wife. According to Ms. Newman, the Petitioner told her that he loved her and that if they could not be together, she "may as well just ... shoot [him]."

Pratikkumar introduced Ms. Newman to Kalpesh. Ms. Newman testified that the Petitioners were very close and referred to themselves as "cousin brothers." Ms. Newman further testified that she believed Kalpesh knew she was in a romantic relationship with Pratikkumar. Ms. Newman introduced Pratikkumar to her parents. Ms. Newman testified that she was "really devastated and heartbroken" when she learned that Pratikkumar's wife was pregnant. In May 2013, Ms. Newman went to India and met Pratikkumar's family and stayed with them.

Ms. Newman testified that when she returned from her trip, she had a conversation with Pratikkumar and asked him, "[A]re we doing this or are we not doing this?"

Ms. Newman recalled that Pratikkumar was "very quiet and shocked" about her question. According to Ms. Newman, Pratikkumar said that he was "working on it" and that they would "be together real soon." Ms. Newman also recalled that Pratikkumar wanted her assurance that she would be a good mother to his daughter.

Ms. Newman testified that in September 2013, Pratikkumar told her that it was okay for her to leave voicemails on his cell phone. Ms. Newman admitted that she and Pratikkumar were calling each other "darling" and texting "I love you" to each other around September 30, 2013. Ms. Newman recalled that on September 30, 2013, Pratikkumar told her that he was meeting Kalpesh because Kalpesh was going to repay some money he owed Pratikkumar.

Ms. Newman testified that Pratikkumar called her after his arrest and told her that he was in a lot of trouble and that she should not talk to anyone. Several weeks after Pratikkumar's arrest, Pratikkumar's father and a translator came to Ms. Newman's home. Ms. Newman claimed that they asked her to come to a van where Pratikkumar was waiting to speak to her. Ms. Newman denied knowing about

Pratikkumar's plan to kill his wife.

Mr. Henderson testified at trial that he was the owner of Henderson Financial Group and that his firm catered to "affluent investors [and] affluent business owners." Mr. Henderson recalled that Pratikkumar was referred to him by one of his clients. Mr. Henderson met with Pratikkumar in July 2013 to discuss issuing life insurance policies for Pratikkumar and his wife. Initially, Pratikkumar asked for a one million dollar policy on his wife. He then asked for a two and a-half million dollar policy before finally requesting a six million dollar policy. Pratikkumar had a five million dollar policy taken out for himself. The insurance policies were issued in August 2013.

Mr. Henderson testified that he did not think the six million dollar policy was excessive given the financial information Pratikkumar provided him. Mr. Henderson further testified that the insurance company would not have issued the policy if it were excessive. Mr. Henderson met with both Pratikkumar and his wife before the policies were issued. Mr. Henderson recalled nothing out of the ordinary occurred during their meeting. Mr. Henderson testified that nothing seemed unusual about their relationship and that there were no "red flags."

Mr. Henderson testified that Pratikkumar wanted to take out a second life insurance policy on his wife valued at four million dollars. Mr. Henderson recalled that Pratikkumar wanted ten million dollars in life insurance for his wife because her family was not as rich as his and he wanted to ensure that all their debts would be paid off if she died. However, prior to September 30, 2013, Pratikkumar requested that the application for the four million dollar policy be withdrawn because the insurance company issuing the policy had more stringent health requirements and the policy was going to be more expensive than the original quote.

Pratikkumar's wife, Krupaben Patel, testified at trial in his defense. Ms. Patel testified that she and Pratikkumar were partners in the ownership of two gas stations. Ms. Patel further testified that she participated in the decision to take out the life insurance policies. According to Ms. Patel, Pratikkumar told her about his affair with Ms. Newman after his arrest and she forgave him. Ms. Patel testified that she had never spoken to the prosecutors about this case. Ms. Patel admitted that no handyman came to her house on October 1, 2013.

*See Patel*, 2017 WL 3669626 at *1-7; Docket No. 1-1, pgs. 1-7.

## II.     PROCEDURAL HISTORY

After a jury trial in 2015, Petitioners were convicted of one count each of solicitation to commit first degree murder, a Class A felony, and one count each of conspiracy to commit first degree murder, a Class B felony. Docket No. 1, pg. 3. The trial court merged the solicitation

convictions into the conspiracy convictions and both Petitioners were sentenced to fifteen years'
incarceration as Range I, standard offenders. Docket No, 1-1, pg. 1. Petitioners appealed their
convictions and raised the following issues: 1) that the evidence was insufficient to sustain their
convictions for conspiracy to commit first degree murder, 2) that the trial court erred in denying
their motion to suppress evidence found on their cell phones because the search was in violation
of the Fourth Amendment, 3) Petitioner Kalpesh asserted the trial court erred in not sentencing
him as an especially mitigated offender, 4) Petitioner Kalpesh contended that a new trial should
be granted based on new evidence impeaching a witness, 5) Petitioner Pratikkumar asserted that
the State withheld exculpatory evidence, and 6) Petitioner Pratikkumar claimed he had ineffective
assistance of counsel. *Id.* The Court of Criminal Appeals of Tennessee denied Petitioners' appeals
on August 25, 2017. *Id.* The court did find that the trial court erred in denying Petitioners' motion
to suppress evidence from Petitioners' cell phones but found that the error was harmless. *Id* at 13.

Petitioners then filed a petition for rehearing with the Tennessee Court of Criminal Appeals
on September 5, 2017, and it was denied on September 7, 2017. Docket No. 1, pg. 5. Petitioners
applied for leave to appeal to the Tennessee Supreme Court. *Id.* The Tennessee Supreme Court
declined permission to appeal on January 17, 2017. *Id.*

Petitioners filed a petition for post-conviction relief on May 7, 2018. *Id.* Petitioners argued
that the admission of their cell phone evidence constituted structural error and that the appellate
court incorrectly applied a harmless error standard. *Id.* at 6. Because the admission was considered
under a harmless error analysis, Petitioners claimed that they were denied a fair trial and asserted
that their convictions should be vacated. *Id.* On June 11, 2018, the Tennessee Criminal Court
dismissed the petition *sua sponte*, finding that the issues had already been determined. *Id.*
Petitioners then filed a motion to reconsider on July 5, 2018, claiming that they had a heightened

right to privacy for cell phone data. *Id.* The State moved to dismiss the motion to reconsider, claiming that it was untimely. *Id.* at 8. The Court of Criminal Appeals denied the motion to dismiss, finding that the Petitioners' motion was timely. *Id.*

On September 6, 2018, Petitioners filed an amended motion to reconsider, adding an ineffective assistance of counsel claim for Petitioner Kalpesh. *Id.* at 7. After an evidentiary hearing, the post-conviction court denied Petitioners' motion to reconsider. Petitioners appealed the dismissal of their requests, and the Tennessee Court of Criminal Appeals affirmed the dismissal. *Patel v. State*, No. M2018-01885-CCA-R3-PC, 2019 WL 5618962, at *1.

Now pending before this Court is Petitioners' "Petition Under 28 U.S.C. § 2254 For Writ of Habeas Corpus and Request for an Evidentiary Hearing" filed on June 10, 2019. Docket No. 1, pg. 1. Petitioners claim that 1) the admission of cell phone evidence was miscategorized as a harmless error and instead constitutes structural error and 2) the admission of the cell phone evidence rendered Petitioners' counsel ineffective in violation of the Sixth Amendment. *Id.*

Respondents filed an answer on January 29, 2020. Docket No. 13, pg. 24. Petitioners request an evidentiary hearing regarding the issues they raise. Docket No. 1, pg. 1. This Court has determined that an evidentiary hearing is not necessary given the extensive existing discussion of the issues raised by the Petitioners.

## III.     STANDARD OF REVIEW

A state prisoner can petition a federal court for relief of a state court convictions by applying for a writ of habeas corpus "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

### A.     Exhaustion Requirement

For a petition for a writ of habeas corpus to be granted, it must appear that: "the applicant

has exhausted the remedies available in the courts of the State;" "there is an absence of available State corrective process;" or "circumstances exist that render such process ineffective to protect the rights of the applicant." § 2254(b)(A)(A)-(B). The exhaustion requirement ensures state courts have "an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition." *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999). To meet that requirement, the state prisoner seeking relief must raise the claims in the available state courts,[2] *Rose v. Lundy*, 455 U.S. 509, 520 (1982), and his claims must "be presented to [those] courts 'under the same theory in which it is later presented in federal court.'" *Wong v. Money*, 142 F.3d 313, 322 (6th Cir. 1998) (citing *Pillette v. Foltz*, 824 F.2d 494, 497 (6th Cir. 1987); *Prather v. Rees*, 822 F.2d 1418, 1421 (6th Cir. 1987)). Though, "when [a] prisoner fails to fully and fairly present his claims to the state courts before the time for him to do so has expired, he procedurally defaults and is foreclosed from federal habeas review of those claims, absent a showing of cause and prejudice or a fundamental miscarriage of justice." *In re Cook*, 215 F.3d 606, 608 (6th Cir. 2000) (citing *O'Sullivan*, 526 U.S. 838 (1999); *Murray v. Carrier*, 477 U.S. 478, 495-96 (1986); *Wainwright v. Sykes*, 433 U.S. 72, 90-91 (1977)).

### B.     Standard of Review for Fully Exhausted Claims

Habeas corpus relief shall only be granted to a state prisoner seeking an application for a writ on fully exhausted claims in two circumstances. *See* 28 U.S.C. § 2254 (d)(1)-(2). The first circumstance is when "the adjudication of the claim . . . resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." *Id.* § 2254(d)(1). "A state court's adjudication of a claim is

---

[2] For claims arising from state criminal proceedings in Tennessee, the exhaustion requirement is met when the Tennessee Court of Criminal Appeals has reviewed the asserted claims of error on the merits. *Adams v. Holland*, 330 F.3d 398, 402 (6th Cir. 2003).

'contrary to' clearly established federal law 'if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or if the state court decides a case differently than the Supreme Court on a set of materially indistinguishable facts.'" *Stojetz v. Ishee*, 892 F.3d 175, 192 (6th Cir. 2018), *cert. denied sub nom. Stojetz v. Shoop*, 138 S.Ct. 1262 (2019) (quoting *Van Tran v. Colson*, 764 F.3d 594, 604 (6th Cir. 2014)). Also, "a state court's decision involves an 'unreasonable application' of federal law when 'the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the petitioner's case.'" *Id.* (quoting *Henley v. Bell*, 487 F.3d 379, 384 (6th Cir. 2007)). "'Clearly established federal law' includes only the holdings of the Supreme Court, excluding any dicta; and an application of these holdings is 'unreasonable' only if the petitioner shows that the state court's ruling 'was so lacking in justification that there was error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement.'" *Id.* (quoting *White v. Woodall*, 572 U.S. 415, 427 (2014)).

The second circumstance in which habeas corpus relief may be granted is when the state's adjudication of a petitioner's claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Further, absent a showing by clear and convincing evidence otherwise by a petitioner, determinations of fact "made by a State court shall be presumed to be correct." *Id.* § 2254(e)(1). To obtain relief under § 2254(d)(2), "it is not enough for the petitioner to show some unreasonable determination of fact; rather, the petitioner must show that the resulting state court decision was 'based on' that unreasonable determination." *Rice v. White*, 660 F.3d 242, 250 (6th Cir. 2011 (quoting 28 U.S.C. § 2254(d)(2)).

## IV.    ANALYSIS

Petitioners raise two claims in their petition for habeas relief: (1) that the admission of evidence that was extracted from Petitioner Pratikkumar's cell phone in violation of the Fourth Amendment was structural, not harmless, error and (2) that this error restricted Petitioners' counsel in such a severe way that it amounted to the denial of effective assistance of counsel in violation of the Sixth Amendment and *Strickland v. Washington*. Docket No. 1, p. 9; 466 U.S. 668 (1984).

## A.      Erroneous Admission of Evidence Error

### 1.      Exhaustion

Petitioners allege that the admission of cell phone evidence from Petitioner Pratikkumar's cell phone constituted structural, not harmless error. Docket No. 1, pg. 28. On appeal to the Tennessee Court of Criminal Appeals, Petitioners contended that the trial court erred in denying their motion to suppress evidence gathered from Pratikkumar's cell phone. Docket No. 1-1, pg. 1. Although the Court of Criminal Appeals found that the trial court erred in admitting the evidence because the search was conducted without a warrant, it found the trial court's error to be harmless because of the "overwhelming" evidence of Petitioners' guilt absent the cell phone evidence. *Id*. at 13.

In their requests for post-conviction relief, Petitioners brought the claim that the appellate court's application of the harmless error analysis was improper, and a structural error analysis should have been applied instead. *Patel*, 2019 WL 561892 at *9. The Rutherford County Circuit Court dismissed both petitions for post-conviction relief, finding that the allegation involving the admission of the cell phone evidence was previously determined as it had been litigated "during a pretrial motion hearing, at the motion for a new trial hearing, and on appeal from the conviction proceedings." *Id.* at *7. The Tennessee Court of Criminal Appeals affirmed the dismissal, finding that the issue had been determined in the Petitioners' original appeal. *Id.* at *9. Therefore,

Petitioners have fully exhausted this claim in the available state proceedings.

        **2.**        **Analysis on Merits**

Petitioners assert in their petition that the admission of evidence obtained from a warrantless search of their cell phones constituted structural error. Docket No. 1, pg. 31. Petitioners argue that because "there was no way trial counsel could avoid or credibly argue away the unlawfully-acquired evidence, due to the trial court's erroneous ruling on the motion to suppress, [trial counsel] were handcuffed and could not really make a viable argument that their client was not guilty." *Id.* at 32. They argue that this error "being structural, removes the case from harmless error analysis, and, instead, squarely places it in the realm of structural error." *Id.* at 31-32.

Generally, constitutional error is divided into two types: (1) trial (or harmless) error and (2) structural defects. *United States v. Gonzalez-Lopez*, 548 U.S. 140, 148 (2006). The most common errors are trial errors. *See id.* at 148 (2006) (citing *Arizona v. Fulminante*, 499 U.S. 279, 306 (1991)). These errors "'occur[] during presentation of the case to the jury' and their effect may 'be quantitatively assessed in the context of other evidence presented in order to determine whether they were harmless beyond a reasonable doubt.'" *Id.* (quoting *Fulminante*, 499 U.S. at 307-08). "Structural defects" 'defy analysis by "harmless error" standards' because they 'affect the framework within which the trial proceeds,' and are not 'simply an error in the trial process itself.'" *Id.* (quoting *Fulminante*, 499 U.S. at 309-10). The Supreme Court has identified narrow categories that amount to structural defects, including: (1) "the denial of counsel;" (2) "the denial of the right of self-representation;" (3) "the denial of the right to public trial;" and (4)" the denial of the right to trial by jury by giving of a defective reasonable doubt instruction." *Id.* at 149; *see also Weaver v. Massachusetts*, 137 S. Ct. 1899, 1908 (2017).

Petitioners have not shown that the state courts unreasonable applied or contradicted clearly established federal law in adjudicating their claims. *See* 28 U.S.C. § 2254 (d)(1)-(2). Petitioners argue that the admission of cell phone evidence constituted structural error because it limited their trial counsel's ability to argue that the Petitioners were not guilty and undermined the framework of the trial. Docket No. 1, pg. 32. This error does not fall within the Supreme Court's categories of structural error, as a limitation on trial strategy does not affect the "framework within which the trial proceeds." *Fulminante,* 499 U.S. at 309-10.

Moreover, regardless of the nature of the error, Petitioners' claim fails because pursuant to the Supreme Court's decision in *Stone v. Powell,* "where the State has provided an opportunity for a full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." *Stone v. Powell,* 428 U.S. 465, 494 (1976). Here, Petitioners' argument rests on a Fourth Amendment claim that the cell phone evidence gathered form a warrantless search was admitted into evidence, thus falling into the purview of *Stone.* Docket No. 1, pg. 31.

In this Circuit, a Petitioner has had the "opportunity for full and fair consideration" if the Petitioner has had "an available avenue for the prisoner to present his claim to the state courts, not an inquiry into the adequacy of the procedure actually used to resolve that particular claim." *Good v. Berghuis,* 729 F.3d 636, 640 (6th Cir. 2013). As Petitioners were able to present a suppression motion at the trial level, and then able to litigate the trial court's denial of the suppression motion both in appellate proceedings and post-conviction proceedings, they had the opportunity for a "full and fair" litigation of this claim. Docket No. 1-1, pg. 13; *Patel*, 2019 WL 561892 at *9; *Stone,* 428 U.S. at 494. Thus, *Stone* precludes Petitioners from succeeding on this claim. *Stone,* 428 U.S. at 494.

Therefore, Petitioners' claim that the admission of cell phone evidence constituted structural error is meritless because Petitioners are unable to get habeas corpus relief from such a claim under *Stone* nor was the error structural. *Stone*, 428 U.S. at 494; *Fulminante*, 499 U.S. at 309-10. The Petitioners have not shown that state courts unreasonably applied or contradicted established federal law in adjudicating the Fourth Amendment and structural error claim.

**B.     Ineffective Assistance of Trial Counsel**

**1.     Petitioner Pratikkumar's Claim**

**a.     Exhaustion**

Petitioner Pratikkumar asserts that his trial counsel was ineffective because his trial attorneys chose to focus on a "narrow approach" and "argue that the State had failed to legally prove the existence of conspiracy due to Mr. Robinson's feigned participation." Docket No. 1-1, pg. 19. Petitioner Prattikkumar alleges that the conduct of his trial attorneys amounted to ineffective assistance of counsel because they argued a "non-existent defense" that is "equivalent to saying and doing nothing." Docket No. 1, pg. 38. This claim was heard and rejected on direct appeal, and then denied again by the Tennessee Court of Criminal Appeals. Docket No. 1-1, pg. 19. Petitioner again brought this claim in a motion for a new trial and in a post-conviction appeal and it was denied both times. *Patel*, 2019 WL 561892 at *8. On appeal of the post-conviction denial, Petitioner again raised the ineffective assistance of counsel claim. *Id.* The Tennessee Court of Criminal Appeals found that "Petitioner Pratikkumar did not receive ineffective assistance. As a result, Petitioner Pratikkumar's ineffective assistance claim against trial counsel has been previously determined, precluding its consideration in this petition for post-conviction relief." *Id.* Thus, Petitioner Pratikkumar has fully exhausted this claim in the available state proceedings.

**b**.     **Analysis on the Merits**

Petitioner Pratikkumar contends that his trial attorneys' decision to argue a "nonexistent defense" raises to the level of ineffective assistance of counsel in violation of the Sixth Amendment for two reasons: 1) that because arguing a non-existent defense will never be successful, it is akin to not having counsel argue anything at all and 2) that the admission of cell phone evidence in violation of the Fourth Amendment "emasculated the ability of trial counsel to effectively defend them," leading to the lack of effective counsel guaranteed by the Sixth Amendment. Docket No. 1, pg. 39. Petitioner Pratikkumar claims that prejudice should be presumed in this case because trial counsel's actions were "tantamount to a complete denial of counsel." *Id.* Thus, Petitioner contends that the appellate court's holding that his Sixth Amendment right was not violated resulted in a decision contrary to, or involved an unreasonable application of clearly established federal law, or resulted in a decision based on an unreasonable determination of facts in light of the evidence before the state court. *Id.*

Respondent argues that the state court's decision does not warrant habeas relief. Docket No. 13, pg. 18. In support of this argument, Respondent claims that Petitioner has not shown that the state courts unreasonably applied the *Strickland v. Washington* standard for analyzing ineffective assistance of counsel claims. *Id.* at 19. According to Respondent, strategic choices made by counsel do not rise to the level of a Sixth Amendment violation. *Id.* at 19 (citing *Burton v. Renico,* 391 F.3d 764, 774 (6th Cir. 2004)). Respondent argues that Petitioners' trial counsel's conduct did not meet *Strickland*'s deficient performance standard because Petitioner did not show that their counsel's trial strategy decisions were outside the range of "professional competent assistance." *Id.* at 19.

In regards to prejudice, Respondent argues that Petitioner did not show that "there was a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

would have been different." *Id.* at 19 (citing *Strickland*, 466 U.S. at 694-5). Respondent points to the state court's findings that "Petitioner's counsels were disappointed in the trial court's ruling [to deny the motion to suppress cell phone evidence] but were in no way devitalized from continuing as effective counsel and, as such, they chose a strategic path forward that best suited the facts and circumstances, going so far as to discuss that trial strategy with Petitioner and obtaining his approval." *Id.* at 20 (citing *Patel*, 2017 WL 3669626 at *19-21.)

The Sixth Amendment, as applied to the states through the Fourteenth Amendment, guarantees a criminal defendant the right to effective assistance of counsel. *See Strickland v. Washington*, 466 U.S. 668, 686-87 (1984); *see generally Gideon v. Wainwright*, 372 U.S. 335, 342 (1963). To substantiate a claim that his counsel was ineffective, a petitioner must prove: (1) that his "counsel's performance was deficient" and (2) that his counsel's "deficient performance prejudiced the defense." *Strickland*, 466 U.S. at 687. "Unless a [petitioner] makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." *Id.* In a court's application of the *Strickland* standard, it is not required that the court analyze one prong before the other nor is it necessary "to address both components of the inquiry if the [petitioner] makes an insufficient showing on one." *Id.* at 697.

In establishing that a petitioner's counsel was deficient, it must be shown that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the [petitioner] by the Sixth Amendment." *Id.* at 687. In other words, counsel's performance must have fallen "'below an objective standard of reasonableness.'" *Campbell v. Coyle*, 260 F.3d 531, 551 (6th Cir. 2001) (quoting *Strickland*, 466 U.S. at 688). The standard for measuring performance under the deficiency prong is "'reasonableness under prevailing professional norms.'" *Id.* (quoting *Strickland*, 466 U.S. at 688). Measuring counsel's performance requires deference to be given to

counsel's decisions, including "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. Accordingly, a petitioner "must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).

Further, proving prejudice to the defense "requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable." *Id.* at 687. In other words, a petitioner must show "by 'a reasonable probability that, but for counsels' errors, the result of the proceeding would have been different.'" *Sylvester v. United States*, 868 F.3d 503, 511 (6th Cir. 2017) (quoting *Strickland*, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. In making this showing, "it is not enough for the [petitioner] to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. "A court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury." *Id.* at 695.

A petitioner does not have to demonstrate prejudice under *Strickland* in three categories of error in which prejudice is presumed: (1) when the right to counsel is denied; (2) when the state interferes "with counsel's assistance;" and (3) when "counsel is burdened by an actual conflict of interest" so long as the petitioner shows "the conflict adversely affected his counsel's performance." *Smith v. Robbins*, 528 U.S. 259, 287 (2000) (citations omitted). Under these circumstances, "prejudice . . . is so likely that case-by-case inquiry into prejudice is not worth the cost." *Strickland*, 466 U.S. at 692.

In the present case, Petitioner Pratikkumar has not demonstrated that the state courts unreasonably applied or contradicted clearly established federal law. *See* 28 U.S.C. §2254(d)(1). The Tennessee Court of Criminal Appeals found that Petitioner's trial counsel did not meet the

deficient performance prong of *Strickland* because trial counsel decided to argue that a conspiracy did not exist because they thought it would be "patently obvious what had happened factually" and that they reviewed the trial strategy with Petitioner Pratikkumar. Docket No. 1-1, pg. 19. Petitioners make no argument for why their trial counsel's conduct was deficient. Instead, they argue that they were prejudiced by their conduct because arguing a non-existent defense amounts to not having trial counsel at all. Docket No. 1, pg. 38. However, Petitioners have not explained how a choice in trial strategy is the same as the denial of counsel. They argue that "logically, the emasculation of a defense is tantamount to a complete denial of counsel." *Id.* at 39. However, they cite no legal authority for this proposition. Further, they have not offered evidence to show that trial counsel's conduct "fell below an objective standard of reasonableness." *Campbell v. Coyle*, 260 F.3d 531, 551 (6th Cir. 2001) (quoting *Strickland*, 466 U.S. at 688). Since Petitioner Pratikkumar has not shown that prejudice should have been presumed in his case or that his trial counsel's conduct was deficient, the state court's adjudication of Petitioner's claim cannot be construed as contrary to or an unreasonable application of clearly established federal law. *See* 28 U.S.C. § 2254(d)(1).

Therefore, Petitioner cannot meet his burden under 28 U.S.C. § 2254(d)(1). As a result, Petitioner Pratikkumar is not entitled to relief on this ground.

### 2.     Petitioner Kalpesh's Claim

#### a.     Exhaustion

Petitioner Kalpesh also contends that his Sixth Amendment right to effective counsel was violated because of his trial counsel's advancing of a non-existent defense to conspiracy. Docket No. 1, pg. 38. Petitioner did not raise this claim in his petition for post-conviction relief. *Patel*, 2019 WL 561892 at *8. It was not until after the post-conviction court summarily dismissed Petitioners' claims that Petitioner Kalpesh raised an ineffective assistance of counsel claim in his

amended motion to reconsider. *Id.* The Tennessee Court of Criminal Appeals found that Petitioner

Kalpesh's claim was waived because he did not bring it in his initial petition for post-conviction

relief. *Id.* That court found that, "the Petitioner was required to include in his petition 'all claims

known to the petitioner for granting post-conviction relief'" and that Petitioner Kalpesh was not

entitled to relief on the basis of ineffective assistance of counsel. *Id.* at *8-9 (citing T.C.A. §40-

30-104(d)). As a result, Petitioner's claim is procedurally defaulted. *See Adams*, 330 F.3d at 402;

*see also In re Cook*, 215 F.3d at 608.

Because this claim is procedurally defaulted, Petitioner had the burden of making a

showing of cause and prejudice for that procedural default. *See West v. Carpenter*, 790 F.3d 693,

697 (6th Cir. 2015) (explaining that procedural defaulted claims "will not be reviewed by federal

courts unless the petitioner demonstrates cause and prejudice for his default"). Attorney error

generally cannot constitute a showing of cause in a federal habeas case because there is no

constitutional right to an attorney at state post-conviction proceedings. *Id.*

Petitioner has not shown cause for this error and thus has not met his burden of overcoming

procedural default. Petitioner Kalpesh did not raise this claim in his petition for post-conviction

relief, despite bringing other claims related to the cell phone evidence and Petitioner Pratikkumar

bringing an identical ineffective of counsel claim. *Patel*, 2019 WL 561892 at *8. Petitioners did

not address establishing cause in their brief. Docket No. 1. Accordingly, the undersigned declines

to reach the merits of this claim and denies Petitioner habeas corpus relief on this ground.

## V.     RECOMMENDATION

For the reasons discussed above, the undersigned recommends that habeas corpus relief be

**DENIED**.

Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has fourteen (14) days

after service of this Report and Recommendation in which to file any written objections to this Recommendation with the District Court. Any party opposing said objections shall have fourteen (14) days after service of any objections filed to this Report in which to file any response to said objections. Failure to file specific objections within fourteen (14) days of service of this Report and Recommendation can constitute waiver of further appeal of this Recommendation. *See Thomas v. Arn*. 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

**JEFFERY S. FRENSLEY**
**United States Magistrate Judge**